UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| JEFFREY PANNELL o/b/o J.P., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CAROLYN W. COLVIN, ) <br> Acting Commissioner of Social Security, ) <br> ) <br> Defendant. ) | No. 1:14 CV 151 DDN |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Jeffrey Pannell o/b/o J.P. (hereafter in this memorandum the court refers to J.P., a boy who was three years of age when the subject application for benefits was filed, as plaintiff) for supplemental security income under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 401. Both parties have consented to the exercise of plenary authority by the undersigned Magistrate Judge under 28 U.S.C. § 636(c).

For the reasons set forth below, this case is remanded for further consideration by the Administrative Law Judge (ALJ).

## I. BACKGROUND

Plaintiff was born on May 26, 2008. (Tr. 131.) Plaintiff filed his Title XVI application on August 10, 2011, alleging a disability onset date of August 26, 2008, due to eczema, bronchitis, and asthma. (Id.) His application was denied initially, and he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 45-48, 51.)

On June 4, 2013, following a hearing, the ALJ denied the application. (Tr. 9-22.) The Appeals Council denied plaintiff's request for review. (Tr. 1-5.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

On July 26, 2010, plaintiff began seeing Kimberly Keser, A.P.R.N., at A Woman's Life Family Healthcare Center. (Tr. 204.) During his initial visit, Nurse Keser diagnosed him with eczema. She noted that he displayed a moderate rash, mainly pink in color, on his entire body. She described some areas of the rash as feeling like sandpaper. (Tr. 205.) She prescribed him Benadryl and Elidel (eczema cream). (Id.)

On a follow-up visit for cough and dry skin on August 11, 2010, J.P. was prescribed Triamcinolone Acetonide (eczema cream). (Tr. 206-08.) On October 30, 2010, J.P. again saw Nurse Keser for eczema, and was prescribed flucticasone/eucerin (eczema cream), and a refill of Benadryl. (Tr. 209-10.)

On November 2, 2010, Nurse Keser saw J.P. for acute cough and wheezing. He was prescribed Albuterol for asthma. (Tr. 212-14.)

On January 8, 2011, J.P. saw Nurse Keser for cough, sore throat, and watery eyes. (Tr. 218.) She noted coarse breath sounds. He was prescribed Cefzil (for skin infections) and Claritin (for allergies). (Tr. 219.) On January 21, 2011, J.P. again saw Nurse Keser for cough and runny nose. He was prescribed Omnicef (an antibiotic), Children's Motrin, Children's Tylenol, and promethazine with dextromethorphan (an antihistamine). (Tr. 224-26.)

On April 11, 2011, plaintiff was seen at the emergency room for cough, congestion, and an infected finger. (Tr. 185.) The attending physician noted mildly labored breathing. (Tr. 186.) He also noted eczema, and described J.P.'s finger as having a weeping, oozing, and scabbed area. (Id.) J.P. was diagnosed with bronchitis and a skin infection on his finger. (Tr. 188.)

On May 2, 2011, plaintiff was seen at the emergency room for rash on his upper face and lower extremities. (Tr. 179.) The attending physician noted rash, with redness

swelling, and open bleeding in some areas from scratching. (Id.) J.P.'s mother stated that she had used cocoa butter on his rash, and believed this caused the increased irritation. (Id.) The attending physician prescribed Orapred (a corticosteroid), and hydrocortisone (a cream for treating allergic reactions). (Tr. 182.)

On August 7, 2011, plaintiff was seen at the emergency room for trouble breathing, coughing, vomiting, and a fever. (Tr. 168.) The attending physician noted wheezing, but also noted that air entry was good. (Tr. 169.) Plaintiff was prescribed amoxicillin (an antibiotic), and prednisolone (a corticosteroid). (Tr. 172.) On a follow-up visit with Nurse Keser on August 8, 2011, plaintiff was prescribed Singulair (for asthma and allergies). (Tr. 235.)

On September 1, 2011, plaintiff was seen by Nurse Keser for a cough. (Tr. 239.) During the visit, Nurse Keser noted a rash, coarse breath sounds, and wheezing in the apices (upper lungs). (Tr. 240.)

On September 14, 2011, plaintiff was seen by Nurse Keser for an evaluation of his seasonal allergies. (Tr. 250.) He was found to be allergic to wheat, peanuts, milk, pet dander, trees, and pigweed. (Tr. 256.)

On October 7, 2011, Rebecca Wotherspoon, M.D., a State agency medical consultant, filled out a childhood disability evaluation form. In her evaluation, Dr. Wotherspoon found that, while plaintiff's impairment or combination of impairments was severe, it did not meet, medically equal, or functionally equal any listing. (Tr. 261.) Dr. Wotherspoon evaluated plaintiff in the domains of: acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for oneself, and health and physical well-being. Dr. Wotherspoon found plaintiff had no limitation in the first five domains, and less than marked limitations in the health and physical well-being domain. (Tr. 263.)

On November 21, 2011, plaintiff was seen by Nurse Keser for a lesion on his right lower extremity, as well as a follow-up for allergies and eczema. Nurse Keser noted a moderate amount of rash, as well as an open wound to his right lower calf measuring

about .5 centimeters. (Tr. 292.) During a follow up appointment two days later, plaintiff's mother reported that the lesion had almost healed. (Tr. 288.)

On February 9, 2012, plaintiff was seen by Dolores McDowell, N.P., in a follow-up visit for an ear infection. (Tr. 276.) Nurse McDowell prescribed him Zyrtec (for allergies), and Derma-Smoothe (a synthetic hydrocortisone). (Tr. 277-78.)

On August 16, 2012, plaintiff was seen by Nurse Keser to request refills on his asthma and eczema medications. (Tr. 269.) Nurse Keser noted severe eczema on plaintiff's arms, hands, legs, and feet. (Tr. 270.)

On February 1, 2013, plaintiff was seen by Susan Farrow, F.N.P., at Cross Trails Medical Center of Marble Hill for a refill of prescriptions, as well as for eczema and allergies. (Tr. 361.) Nurse Farrow noted that J.P.'s lungs sounded clear, and no wheezing was detected. (Id.) She noted that his skin was dry, and had fissuring with scabs and cracking on his face, scalp, neck, chest, back, stomach, hands, arms, legs, and tops of his feet. (Tr. 362.)

On March 8, 2013, plaintiff was seen by Susan Bayliss, M.D., a pediatric dermatologist, for a rash on his face and body. (Tr. 369.) Dr. Bayliss diagnosed him with eczema and a bacterial "superinfection." (Tr. 370.) She noted scaly plaques and crusting and his face and body. (Id.)

On April 11, 2103, plaintiff was seen by Dr. Bayliss for a follow up. (Tr. 367-71.) Dr. Bayliss noted that in her opinion, J.P. suffered from no pain, and only mild pruritus (itching). (Tr. 367.) She noted that his eczema was much improved from his last visit, and he was experiencing much less itchiness, although he still had significant disease on his skin, specifically noting scaly pink patches on his face, neck, and elbows. (Tr. 371.)

### **III. ALJ HEARING**

On May 1, 2013, a hearing was conducted before an ALJ. (Tr. 26-43.) Plaintiff was represented by counsel and his father, Jeffrey Pannell, testified to the following. He is the father of claimant, J.P., who was then four years old and who had lived with him and been under his care his whole life. J.P.'s mother and four sisters also live in the

household with them. Mr. Pannell testified that eczema, asthma, and some allergies were the problems J.P. was having that initially made him decide to apply for disability for him. (Tr. 31-32.)

He has had problems with eczema since the age of four months. The eczema causes itching, scratching, and sometimes causes J.P. to have problems walking due to the itching and scratching. It is a constant problem. Since J.P. was four months old, he has never been free of rash for any period. The rash affects him all over his body, and does not tend to be worse in certain areas. The rash does fluctuate, but J.P. usually has rash everywhere. He can tell by looking when J.P has an outbreak. It looks like a big red rash, and itches badly. (Tr. 32-33.)

When J.P. has a flare up, Mr. Pannell treats it with cream, Vaseline, and sometimes steroid medication. The doctor typically prescribes J.P. the steroid medication about once every six to eight weeks. The steroid medication helps sometimes, but has the side effects of irritability, crankiness, and mood swings. Mr. Pannell attributes this to J.P. not liking to take the medication. J.P. also sometimes gets mad or mean and wants to fight with his sisters when he takes the steroid medication. He also gets up every morning in a cranky mood when taking steroids, but his mood fluctuates from one minute to the next. (Tr. 33-34.)

He has not noticed anything that tends to aggravate J.P.'s eczema. When J.P. goes outside during the summer, it causes him to sweat, which makes the rash burn and exacerbates the itching. Because of this, they do not allow J.P. to stay outside for more than a one and a half to two hour period during the summer. When J.P. is exposed to direct sunlight, or even shade during the summer, he still sweats, which causes itching even when sitting still. (Tr. 34.)

The rashes cause J.P. pain. The most recent instance of J.P. mentioning he had pain, the rash was on his feet and legs. He also sometimes has a hard time sitting down due to pain when he has rash under his buttocks. When J.P.'s feet break out, they get dry and crack open during the summer. This causes him problems with walking, and he sometimes has to walk on his tip toes. When the rash affects his legs and feet, J.P. is

unable to wear socks and shoes because doing so causes him to walk sideways or on the sides of his feet due to the pain. (Tr. 34-35.)

J.P. also gets rashes on his hands quite often. This causes them to itch, and when he scratches the rash, the skin opens up which causes scabbing and can cause infection. When his hands are affected, he is unable to do his normal activities around the house because his hands hurt too badly. His hands and fingertips crack open and he is unable to pick things up like most children are able to do. When the skin on his fingers is cracked, he cannot pick up and play with small toys. J.P. often gets rashes on his head and his face also. When he does, he asks his parents if they are going to put cream or Vaseline on him, or what they are going to do. (Tr. 35-36.)

The rashes affect his bathing as well. J.P. can get in the water, but cannot use soap or other products because it dries out his skin. He says the water burns him when he is in the bath, and when he gets out and is being dried off, it continues to burn. (Tr. 36.)

When his fingers and hands are affected, J.P. is unable to hold a toothbrush, but when they are not affected, he can. Although he currently has no hair, the same was true of using a hairbrush to brush his hair when he did have hair. J.P. also sometimes has problems cleaning himself when he uses the restroom. (Tr. 37.)

On an average day around the house, J.P. likes to play with toys. He also likes to play outside, but it is hard for him to do so when it is hot outside. (Id.)

J.P also has a problem with asthma. Asthma has been a problem for him for about the last two to two and one half years. It bothers him a couple of times per month. This necessitates his parents giving him breathing treatments. (Tr. 37-38.)

J.P. has a nebulizer, which he uses two to three times monthly. Playing outside for a couple hours at a time leads to wheezing, at which point his parents bring him inside and administer either a breathing treatment or inhaler spray. He uses the inhaler twice daily. About three months ago, J.P.'s doctor switched the type of inhaler he uses. The doctor said they switched inhalers because the new inhaler was stronger, and the doctor believed it would be more effective. (Tr. 38.)

Apart from being active, some allergies also trigger J.P.'s asthma.  He is allergic to peanuts, all dairy products, eggs, and red dye.  He is also not supposed to have any chocolate.  J.P. is also allergic to pollen, walnut trees, ragweed, and a couple other things that Mr. Pannell is unable to recall.  J.P. does have an understanding of things he is supposed to avoid because of his allergies.  He has never had an accident with any of the foods he is allergic to because his parents do not allow him to have them.  When he is outside of the home, J.P. asks about things he can or cannot have.  He asks what certain items contain or whether they contain milk, or whether bread is regular or wheat. J.P.'s parents still have to monitor what he eats, though.  (Tr. 38-40.)

J.P. does not stay overnight at anyone else's home because his parents are afraid someone may not be up-to-date on his problems and may give him something he is allergic to.  He has never been to a day camp or summer camp, but his parents are planning to let him play T-ball this summer to see how he does.  He has never participated in other activities, such as Boy Scouts or a church group.  (Tr. 40.)

As for treatment for J.P.'s eczema going forward, doctors have advised his parents that all they can do for now is apply the creams three to four times daily, makes sure to administer Vaseline, and not give him anything to eat or drink that he is allergic to.  (Id.)

J.P. does not apply cream to himself.  His parents have tried to get him to, but he says that he cannot do it because it burns too badly.  He asks his mother to put it on instead. (Tr. 40-41.)

The ALJ then asked Mr. Pannell questions, to which he testified to the following. There was a referral for J.P. to Saint Louis dermatology, which he has been to twice.  He was seen there by Dr. Bayliss, who advised them not to use any soap or shampoo on him, and to use the prescribed cream three times daily, while using Vaseline in between. Additionally, Dr. Bayliss advised them to add a quarter cup of bleach in his bath water. She also wanted to see J.P. for a follow-up later in the month. Mr. Pannell has not seen any change since they started doing what Dr. Bayliss suggested.  (Tr. 41-42.)

## IV. DECISION OF THE ALJ

On June 4, 2013, the ALJ issued a decision finding that plaintiff was not disabled. (Tr. 9-25.) The ALJ found that plaintiff had not engaged in substantial gainful activity since August 10, 2011, the application date. The ALJ found that plaintiff had the severe impairments of eczema and asthma. However, the ALJ found plaintiff did not have an impairment or combination of impairments that meet, medically equal, or functionally equal to ones contained in the listings, 20 C.F.R. part 404, subpart P, appendix 1. (Tr. 15.)

In determining whether J.P.'s impairments functionally equaled a listing, the ALJ found that J.P. had no limitations in the domains of acquiring and using information and of moving about and manipulating objects; he had "less than marked" limitations in the domains of attending and completing tasks, of interacting and relating with others, and of caring for yourself; and, "marked" limitations in the domain of health and physical well-being. (Tr. 17-21.)

## V. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeirer v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

A child is "disabled for purposes of SSI if that individual has a medically determinable physical or mental impairment, which results in marked and severe

functional limitations" that have lasted or can be expected to last for at least twelve months or result in death. 42 U.S.C. § 1382c(3)(C)(i).

A four-step regulatory framework is used to determine whether a child is disabled. The steps require the claimant to prove (1) he is not currently engaged in substantial gainful activity; (2) he suffers from a severe impairment; (3) his condition meets or equals a listed impairment; and, (4) if not, do his impairments "functionally equal" a listed impairment. 20 C.F.R. § 416.924(a); 20 C.F.R. pt. 404, subpt. P, app. 1, pt. B; Walker v. Apfel, 141 F.3d 852, 854 (8th Cir. 1998).

The inquiry only proceeds to step four, the "functional equivalence" step, if the ALJ finds that (1) the child is not engaged in substantial gainful activity; (2) the child has an impairment or combination of impairments that is severe; and (3) those impairments do not meet or medically equal a listed impairment. Once the ALJ reaches the "functional equivalence" step, the ALJ considers how the child's impairment, or combination of impairments, has affected his abilities within six broad domains of functioning. Together, these domains are "intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and, (6) health and physical well-being. (Id.)

A child's impairments will be found to "functionally equal" a listed impairment if they cause the child to have "marked" limitations in at least two of the domains, or an "extreme" limitation in at least one domain. 20 C.F.R. § 416.926a(d). A child has a "marked" limitation in one of these domains when his "impairment(s) interferes seriously with his ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i); see also Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 651 (8th Cir. 2004) (quoting § 416.926a). Likewise, a child has an "extreme" limitation when his "impairment(s) interferes very seriously with his ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3). There may be "marked" or "extreme" limitations in only one activity, or in several activities as a result of the

interactive and cumulative effects of the child's impairments. 20 C.F.R. § 416.926a(e)(2)-(3). To determine whether the child is experiencing "marked" or "extreme" limitations in the domains, the ALJ must review all the evidence in the record, and compare the child's functioning to "the typical functioning of children [the child's] age who do not have impairments." 20 C.F.R. § 416.926a(f)(1); see also 20 C.F.R. § 416.924a(b)(5)(ii); 20 C.F.R. 416.926a(b). The ALJ considers "the effects of structured or supportive settings," how the child functions in school, and the effects of the child's medications, if any. 20 C.F.R. § 416.926a(a)(1)-(3). Finally, in determining a child's disability, the ALJ must consider all relevant evidence, which may include medical evidence and information from people who know the child, such as parents and teachers, who can provide evidence about his functioning. 20 C.F.R. § 416.924a(a).

## VI. DISCUSSION

Plaintiff claims that the ALJ erred by (1) neglecting to provide a credibility analysis regarding the testimony of J.P.'s father, Jeffrey Pannell; and, (2) failing to adequately consider whether or not J.P.'s impairment of eczema met or equaled Listing 108.04. On the second point, the court agrees.

**A. Credibility Analysis**

The plaintiff argues that the ALJ failed to conduct a credibility analysis regarding J.P.'s father Jeffrey Pannell, but is required to do so by 20 C.F.R. § 416.928(a). The court disagrees.

If the child claimant is unable to adequately describe his symptoms, the ALJ must accept the testimony of the person most familiar with the child's condition. 20 C.F.R. § 416.928(a). While 20 C.F.R. § 416.928(a) makes no mention of a credibility analysis, it has long been held that when rejecting a claimant's testimony, the ALJ must make an express credibility determination detailing her reasons for discrediting the testimony. Ricetts v. Sec'y of H.H.S., 902 F.2d 661, 664 (8th Cir. 1990). The Tenth and Second Circuits have also extended this requirement to cases involving uncontradicted witness

testimony, holding that a "finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review." Briggs ex rel. v. Massanari, 248 F.3d 1235, 1239 (10th Cir. 2001); Martins v. Chater, 112 F.3d 504, 504 (2d Cir. 1996) (citing Williams v. Bowen, 859 F.2d 260-61 (2d Cir. 1988). "The failure to make credibility findings regarding the [mother's] critical testimony fatally undermines the Secretary's argument that there is substantial evidence adequate to support his conclusion that claimant is not under a disability." Briggs ex rel., 248 F.3d at 1239.

Here, however, the ALJ did not reject Mr. Pannell's testimony. The ALJ made note of Mr. Pannell's testimony at several points in her opinion, even noting a finding of a marked limitation in the domain of health and physical well-being after taking "strong consideration of the claimant's father's testimony." (Tr. 16, 18, 21.) The ALJ also mentioned giving less weight to the Childhood Disability Evaluation Form completed by a State agency medical consultant, because the consultant did not have the benefit of examining the evidence from the 18-20 months prior to her examination of J.P. (Tr. 16.)

The opinion of a treating physician is normally entitled to great weight. Singh v. Apfel, 222 F.3d 448 (8th Cir. 2000) (saying treating physician given "controlling weight" if substantiated by the record); see also 20 C.F.R. § 404.1527(d)(2). J.P.'s primary care physician, Dr. Bayliss, reported that J.P. had no functional limitations, no side effects from medication, no pain, and only mild pruritus symptoms in a functional assessment she completed in April 2013. (Tr. 367.) Given Mr. Pannell's lack of medical training, it was within the purview of the ALJ to accord more weight to the opinion of Dr. Bayliss than to Mr. Pannell. It does not then follow that the ALJ discredited Mr. Pannell's testimony.

**B. The Listings**

Plaintiff also argues that the ALJ failed to properly consider whether or not J.P.'s severe impairment of eczema met or equaled Listing 108.04. The court agrees.

Listing 108.04 requires a finding that a claimant have chronic infections of the skin or mucous membranes, with extensive fungating or extensive ulcerating skin lesions

that persist for at least three months despite continuing treatment as prescribed. 20 C.F.R. Pt. 404, Subpt. P., App. 1. At Step Three of her analysis, the ALJ concluded that J.P.'s impairments did not meet, medically equal, or functionally equal the severity of any listed impairment. (Tr. 15.) As a result, the ALJ continued to Step Four, and denied J.P.'s claim for benefits. In concluding that J.P.'s impairment did not meet or medically equal any listed impairment, the ALJ never mentions Listing 108.04 or any other listing. Plaintiff contends that substantial evidence in the record supports the conclusion that J.P. met or medically equaled the listed impairment for Listing 108.04.

Generally, an ALJ's failure to adequately explain her factual findings is not a sufficient reason for setting aside an administrative finding where the record supports the overall determination. Pepper v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003); see also Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999). However, the Eighth Circuit has also held that a remand is required where the ALJ's conclusions, considered in light of the record as a whole, are insufficient to permit a finding by the court that substantial evidence supports the Commissioner's decision. Pettit v. Apfel, 218 F.3d 901, 903-04 (8th Cir. 2000); see also Chunn v. Barnhart, 397 F.3d 667, 672 (8th Cir. 2005). Both of these cases were remanded because the court deemed the ALJ's factual findings to be inadequate for meaningful judicial review. In Chunn, the ALJ failed to reference the listing for the impairment that he had already concluded the claimant had. 397 F.3d at 671. Because of this, the court held that it was unable to reach a conclusion as to whether substantial evidence supported the finding that the claimant did not meet or medically equal a listing, and remanded the case. Id. at 672. In the case at bar, nothing in the ALJ's decision indicates that she considered specifically whether plaintiff's symptoms medically equaled Listing 108.04. Instead, the ALJ's decision speaks only in general terms about considering all of the relevant evidence. The ALJ describes the evidence she considered in her discussion about whether J.P.'s impairments functionally equals a listing; however, the ALJ failed to support her finding that J.P. did not meet or medically equal the severity of a listed impairment. The record contains inconsistencies regarding how extensive and severe plaintiff's eczema is. (Compare Tr. 32-33, 179, 186, 188, 205,

292, 362, 371 with 261, 288, 367, 371.)  As a result, the court is unable to determine whether substantial evidence supports the ALJ's finding that J.P.'s impairments did not meet or medically equal Listing 108.04.

## VII.  CONCLUSION

The court concludes that the ALJ failed to properly consider whether J.P.'s impairments meet or medically equal Listing 108.04.  Accordingly, for the reasons set forth above, this case is remanded to the ALJ to consider and specifically address whether J.P.'s impairments meet or medically equal Listing 108.04.  An appropriate Judgement Order is issued herewith.


    /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on August 17, 2015